IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION


JERRY L. ENGLAND                                                    PLAINTIFF

            v.                      Civil No. 09-2066

MICHAEL J. ASTRUE, Commissioner
Social Security Administration                                     DEFENDANT

### <u>MEMORANDUM OPINION</u>

        Plaintiff, Jerry England, brings this action under 42 U.S.C. § 405(g), seeking judicial

review of a decision of the Commissioner of Social Security Administration (Commissioner)

denying his claims for a period of disability, disability insurance benefits ("DIB"), and

supplemental security income ("SSI")  under Titles II and XVI of the Social Security Act

(hereinafter "the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  In this judicial review, the

court must determine whether there is substantial evidence in the administrative record to

support the Commissioner's decision.  *See* 42 U.S.C. § 405(g)*.*

### <u>Procedural Background</u>

        The plaintiff filed his applications for DIB and SSI on August 15, 2007, alleging an onset

date of August 1, 2007, due to bulging disks in his lower back, instability in his left shoulder,

post traumatic stress disorder ("PTSD"), and dysthymia.  (Tr. 14-, 90, 94, 128, 163-164).  His

application was initially denied and that denial was upheld upon reconsideration.  (Tr. 47, 58,

63).  Plaintiff then made a request for a hearing by an Administrative Law Judge (ALJ).  An

administrative hearing was held on November 18, 2008. (Tr. 8-41).  Plaintiff was present and

represented by counsel.

At this time, plaintiff was 36 years of age and possessed the equivalent of a high school education.  (Tr. 12, 219).  He had past relevant work ("PRW") as a mail handler, motor vehicle dispatcher, police officer, criminal investigator, and general supply technician.  (Tr. 12, 30-31, 145-152).  Plaintiff also testified that he was a full-time student at the University of Arkansas Fort Smith seeking a degree in business administration.  (Tr. 24, 137).

On March 24, 2009, the ALJ found that plaintiff's degenerative disk disease of his lumbar spine, right ankle snapping, and peroneous brevis tendon were severe, but did not meet or medically equaled one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. (Tr. 49-52, 135-136).  After partially discrediting plaintiff's subjective complaints, the ALJ determined that plaintiff retained the residual functional capacity to perform sedentary work that did not involve overhead reaching with his left arm, climbing, or more than occasional balancing, stooping, kneeling, crouching, crawling, and exposure to workplace hazards.  (Tr. 53-56).  With the assistance of a vocational expert, the ALJ found plaintiff return to his PRW as motor vehicle dispatcher or general support technician as those jobs are generally performed in the national economy.  (Tr. 56).

Plaintiff appealed this decision to the Appeals Council, but said request for review was denied on May 12, 2009. (Tr. 1-3).  Subsequently, plaintiff filed this action.  (Doc. # 1).  This case is before the undersigned by consent of the parties.  Both parties have filed appeal briefs, and the case is now ready for decision.  (Docs. 10, 11).

**Applicable Law**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir.

AO72A
(Rev. 8/82)

2002).  Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision.  The ALJ's decision must be affirmed if the record contains substantial evidence to support it.  *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).  As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently.  *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001).  In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed.  *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A).  The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § § 423(d)(3), 1382(3)(c).  A plaintiff must show that his or her disability, not simply their impairment, has lasted for at least twelve consecutive months.

**<u>Discussion</u>**

After reviewing the medical evidence of record, the undersigned finds that the ALJ's RFC is not supported by substantial evidence.  RFC is the most a person can do despite that

person's limitations.  20 C.F.R. § 404.1545(a)(1).  A disability claimant has the burden of establishing his or her RFC. *See Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir.2004).  "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).  Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3).  The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001).  Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003).

The evidence shows that plaintiff was suffering from depression.  On June 25, 2007, a primary care physician's note indicates that plaintiff was disabled due to a limited range of motion in his arm (20%), degenerative arthritis of the spine (40%), and a limited range of motion in his ankle (0%).  (Tr. 343-347).  He tested positive on both the PTSD and depression screens. Dr. Chitra Annamalai diagnosed plaintiff with lower back pain and left shoulder pain.  She advised plaintiff to continue taking the Hydrocodone and Flexeril as needed and increased his Hydrocodone dosage.  Dr. Annamalai noted that his depression was also in need of better control, so she increased his Fluoxetine dosage. She noted that plaintiff was taking medication for hypothyroidism, but was awaiting lab results before making any further medication adjustments. (Tr. 343-347)

4

On August 29, 2007, plaintiff phoned the Veteran's Administration ("VA") Clinic requesting a referral for mental health treatment due to nightmares and flashbacks of his active duty experience. (Tr. 238-239, 340-341). Plaintiff had worked as a criminal investigator while serving in the Marines. He was also experiencing depression related to his military career and civilian and family situation. On PTSD and depression screens, plaintiff tested positive. (Tr. 238-239).

On September 5, 2007, plaintiff was referred to the VA's Mental Health Clinic ("MHC") for the treatment of resistant depression. (Tr. 334-339). Brian Tankersley, a physician's assistant noted that plaintiff was ambulating slowly with assistance. He had been taking Citalopram for over year and had taken Prozac for about a year or two before that. Plaintiff reported no improvement in his mood, stating that it had actually worsened over the previous six months. He rated it as a 7 on a 10-point scale. Plaintiff attributed his depression to his medical conditions and the pain that was associated with them. He denied experiencing anxiety symptoms, but stated that he did feel tired all the time and was socially withdrawing. Plaintiff was enrolled full-time at UAFS and reported that school was going well, but felt that he was a failure because he was too young to be suffering from chronic pain. At this time, he rated his pain as a 8. Plaintiff reported that the pain was persistent and interfered with his ability to function. As his depression had increased, he had also begun to experience flashbacks from his military duties as a criminal investigator working homicide cases. Mr. Tankersley noted that plaintiff was calm and polite, made poor eye contact and exhibited monotone speech, was depressed, had a slightly flat affect, and exhibited linear thought processes. He diagnosed plaintiff with depressive disorder secondary to his general medical condition. Mr. Tankersley

5

noted that plaintiff had been on an adequate trial of SSRI's with no clinical improvement. Accordingly, he opted to continue the Celexa and also prescribed Wellbutrin. He also referred plaintiff to a psychiatrist for long-term treatment. Mr. Tankersley opined that plaintiff was stable, but given his poor treatment response and his worsening pain and thyroid condition, chances were good that his depression would continue to be difficult to treat. (Tr. 334-339).

On September 14, 2007, the VA mental health clinic phoned plaintiff for a welfare check concerning his depression. (Tr. 332-333). Plaintiff stated that he had not yet noticed any benefit from the Wellbutrin. He was encouraged to continue taking his medication. Plaintiff stated that he was feeling sluggish and requested an increase in his thyroid medication. (Tr. 332-333).

On September 20, 2007, plaintiff phoned to tell Mr. Tankersley that he was ready to increase his Wellbutrin dosage. (Tr. 329). However, due to having college classes on Tuesday, he was not going to be able to keep his appointment. (Tr. 329).

On October 9, 2007, plaintiff followed up with the mental health clinic. (Tr. 322-328). Plaintiff reported good and bad days concomitant with the severity of his back pain and functional abilities. He described himself as sad most of the time, sometimes crying, low energy, less desire to do things, difficulty concentrating, frequently wanting to be alone, anxious, irritable, down on self at times, and frustrated. Plaintiff believed his mood had begun to slightly improve with Bupropion. In fact, he was attending UAFS seeking a degree in marketing. Dr. Martin Cohen noted that plaintiff was alert, cooperative, reasonably dressed, and groomed using a cane for an antalgic gait. His mood was euthymic to mildly irritable with an appropriate affect. Dr. Cohen diagnosed plaintiff with depression (dysthymia?) associated with chronic pain and disability and assessed him with a global assessment of functioning ("GAF") score of 67, noting

6

some improvement.  The Citalopram was discontinued and Trazodone prescribed in its stead and plaintiff was advised to continue the Bupropion.  (Tr. 322-328).

On December 5, 2007, plaintiff underwent a mental diagnostic evaluation with Dr. Kathleen Kralik.  (Tr. 370-375).  Plaintiff complained of isolation, crying, problems concentrating, feeling helpless, irritability, trouble sleeping, and restlessness.  He stated that he could not work full-time due to physical limitations and disability related to his back.  With further prompting, plaintiff went on to say that he could not stay in any position for any length of time, could not stand or walk for any length of time, was depressed, found it difficult to concentrate on things, and did not want to be around others.  Dr. Kralik questioned how he was able to do so well with his full-time college studies and he stated that it was difficult.  Plaintiff indicated that his friends helped him take notes and study.

Plaintiff described a chronic low grade depression.  Dr. Kralik noted that he seemed more dysthymic and characteristically negative or pessimistic in his thinking than clinically depressed. He denied obsessive thought processes and did not readily describe a major depressive episode. When asked how the depression rendered him unable to work, he simply stated that he did not want to got out of bed everyday and did not want to be around others.  Plaintiff reported attending classes two days per week and having friends, but stated that he did not get out socially.  He alleged to be crying 5-6 times per day, but stated that he was not receiving psychotherapy through the VA because he did not know whether they had such services or not.

Plaintiff talked about how his children had been kidnaped by his ex-wife in 2001. Despite his training and experience as a criminal investigator, he had not been able to find them. Dr. Kralik noted the VA records indicated that plaintiff had not seen his children in 6 years, but

AO72A
(Rev. 8/82)

said noting about a kidnaping.  Further, they had assessed his depression to be secondary to his pain issues, although plaintiff was now asserting the kidnaping was the underlying cause for his depression.

Plaintiff indicated that his current medications were Levothyroxine, Trazadone, Bupropion, Cyclobenzaprine, and Hydrocodone.  He seemed very vested in the notion that nothing worked.  However, upon further questioning, he did stated that the Zoloft decreased the frequency of his nightmares.  His affect was appropriate to his speech content and his range of expression seemed to be within normal limits.  Plaintiff was mildly tearful at times, but seemed to recover quickly.  He gave the impression more of someone resentful that things had not gone his way than a depressed person.  His thinking was logical, organized, and goal-directed.  No unusual thought content was evident and no evidence of delusions was noted or reported.  Dr. Kralik estimated plaintiff to be functioning in the average range of intelligence.  His processing speed and efficiency seemed adequate, even assuming he might be experiencing cognitive difficulty due to pain.  In fact, no significant signs of cognitive impairment were evident on his mental status exam.  Dr. Kralik diagnosed plaintiff with pain disorder associated with both psychological factors and a general medical condition and dysthymia.  She assessed his global assessment of functioning ("GAF") score  to be between 61 and 70, with his highest of the year falling between 65 and 75.  There seemed to be inconsistencies in his reports and exaggeration was suspected.  She concluded that plaintiff's capacity to carry out activities of daily living and daily adaptive functioning was somewhat impaired for occupational purposes.  His ability to communicate and interact in a socially adequate manner was estimated to be adequate as was his ability to communicate in an intelligible and effective manner, cope with the typical

8

mental/cognitive demands of basic work-like tasks, attend and sustain concentration on basic tasks, and sustain persistence in completing tasks for occupational purposes. Plaintiff's ability to complete work-like tasks within an acceptable time frame seemed at most to be mildly impaired. Dr. Kralik noted that the school had not made any modifications associated with any of his disabilities, and plaintiff admitted he had not mentioned his disability to the school. Although plaintiff alleged that he needed more frequent breaks than others and completed his college exams at a somewhat slower pace than others, he completed his exams and made good grades. Dr. Kralik indicated it was just not clear that plaintiff would need more breaks than his age peers completing similar tasks. (Tr. 370-375).

On January 23, 2008, plaintiff phoned the VA stating that his nightmares were getting worse. (Tr. 487-488). He reported nightmares of seeing dead bodies from when he was criminal investigator. Plaintiff was offered counseling. He stated he had never been told what his diagnosis was and had been reading about PTSD lately. Plaintiff was advised that he was being treated for depression. He reported not sleeping well because of the nightmares and his chronic pain. Plaintiff claimed to take Trazodone with very little relief. He agreed to speak with a counselor about his nightmares and requested an earlier appointment with Dr. Martin Cohen, a psychiatrist. Dr. Cohen indicated that he would be happy to refer plaintiff for counseling concerning his nightmares and unresolved memories. He also stated that if plaintiff had been taking his medication as prescribed, without improvement, they would need to increase his medication dosage. If he was not sleeping well, he could also increase his dosage of Trazodone, as long as plaintiff was not having daytime drowsiness or other problems. However, plaintiff

AO72A
(Rev. 8/82)

did not want to handle a medication adjustment over the phone and was scheduled for an earlier appointment.  (Tr. 489).

On January 30, 2008, plaintiff presented for mental health treatment.  (Tr. 482-485).  Dr. Cohen noted that plaintiff had experienced some improvement with the addition of Bupropion as an add on to Citalopram back in October.  Plaintiff scheduled this follow-up to discuss medication changes.  He stated that his side effects were gradually worsening with low mood, less desire and energy, impatience with self and others, restless with decrease ability to concentrate, down on self but no guilt, difficulties with sleep due to pain and nightmares, uncertain looking future, increased nightmares (dead bodies), and some intrusive memories. Plaintiff did not like to talk about his military experience and was beginning to avoid CSI-like programs.  He denied difficulty in public places and was able to sometimes enjoy visits with his son.  In spite of his symptoms, Dr. Cohen noted that he was doing well in school.  Plaintiff stated that he was taking the Bupropion regularly, but was not taking the Trazodone as prescribed.  He believed it was causing him to experience problems with erectile dysfunction.  Dr. Cohen noted that plaintiff was cooperative, had a mildly low mood with an appropriate-somber-restricted range affect.  His thought content was spontaneous and he voiced no thoughts of harm to himself or others.  Dr. Cohen diagnosed him with anxiety secondary to chronic pain with a GAF of 65. He also believed plaintiff might have an element of PTSD.  He increased plaintiff's Bupropion dosage and encouraged him to continue the Trazodone to help with sleep.  Plaintiff agreed.  (Tr. 482-485).

On February 20, 2008, Dr. Cohen advised plaintiff that if he had been taking the Bupropion as prescribed for the previous three weeks and it was not helping, then the medication

was unlikely to be helpful to him.  (Tr. 477).  He recommended that  plaintiff gradually discontinue the medication by reducing his dosage over a 9 day period.  If he would like to consider a different antidepressant/anti-anxiety agent, Dr. Cohen indicated that Remeron was the only one with minimal reported effects on sexual function.  He stated that it was associated with weight gain and was usually sedating, but could be taken just once per day, at bedtime and might allow plaintiff to discontinue the Trazodone and other sleep aides.  Improvement with this medication, however, would also be gradual, over a period of weeks.  Otherwise, Dr. Cohen recommended Zoloft or Paxil.  Plaintiff was to let him know if he wanted to pursue medication therapy using any of these medications.  (Tr. 477).  Plaintiff stated that he did not want the weight gain or sexual dysfunction associated with these medications and opted to continue with the Bupropion.  Although he did not feel that the increase in dosage had improved his mood, the initial starting of the medication had helped.  (Tr. 477-478).

On March 17, 2008, plaintiff was evaluated by Linda Bell at the VA Mental Health Clinic.  (Tr. 468-471).  He stated he had "depression about a lot of things."  His symptoms included irritability, a decreased toleration level, feelings of powerlessness, and sadness.  Due to his resistance level, Ms. Bell noted that she was unable to explore all causes of his symptoms, but would continue gathering information during his next session.  Plaintiff indicated that his depression was centered around the kidnaping of his two older children in 2001.  Since that time, he had been extensively involved in attempting to secure their return.   At this time, plaintiff indicated that his children and their mother had been located in Alabama, "whether a judge [was] protecting them and [had] broken some federal laws to protect her and the children."  He then spoke of regrets and resulting feelings of guilt for some of his own behavior that may have

11

contributed to the kidnaping. Plaintiff indicated that he was currently being treated via psychotrophic medication by Dr. Cohen. At plaintiff's request, individual therapy was continued. Ms. Bell discussed the benefits, alternatives, and rationale for his treatment plan and he actively participated in and agreed to the plan. Ms. Bell diagnosed plaintiff with depressive disorder not otherwise specified, personality disorder not otherwise specified, and poor coping skills. She assessed with a GAF of 65. (Tr. 468-471).

On March 26, 2008, plaintiff underwent a compensation and pension examination. (Tr. 455-467). Along with plaintiff's ankle and back impairments, records indicate that plaintiff also described social isolation and suicidal ideation with no current plan. (Tr. 395). His affect was constricted and he appeared to be in obvious pain. Difficulty with concentration and focus were also noted. The examiner made a GAF assessment of 45 for a diagnosis of major depression including suicidal ideation, complete social isolation, and much difficulty with concentration and focus. (Tr. 395).

On May 8, 2008, the Department of Veteran's Affairs rendered a rating decision regarding plaintiff's disability. (Tr. 393-405). He was determined to have a 50% disability rating for service connected major depression, a 10% rating for the residuals of a sprained right ankle with snapping peroneous brevis tendon, and a 40% rating due to a bulging disk with sack compression as the L4-5 and bulging annulus at the L5-S1. This gave plaintiff a 100% disability rating according to the VA guidelines. However, service connection disability for PTSD was denied. (Tr. 393-405).

On June 20, 2008, plaintiff was treated by urgent care physician Dr. Nancy Haller. (Tr. 440-444). In addition to seeking treatment for an ankle injury, plaintiff complained of continued

AO72A
(Rev. 8/82)

problems with ED.  Dr. Haller had plaintiff discontinue the Trazodone and prescribed Xanax in its stead to see if there was any improvement in his sexual dysfunction.  (Tr. 440-444).

This same date, plaintiff was evaluated by the mental health clinic.  (Tr. 445-446).  He stated that things were no different.  He had moved out of his parents house and was living in his own place with his girlfriend.  He was alert and oriented and denied hallucinations and suicidal/homicidal ideations. Plaintiff's thought processes were coherent, logical, and goal directed.  His content of thought was primarily related to his recent stressors, but there was no flight of ideas or apparent delusions.  Plaintiff rated his pain as a 9 on a 10-point scale and his depression as a 10.  He stated that he was out of Wellbutrin, but that a refill had been ordered. Plaintiff reported that his depression was primarily associated with his children who were kidnaped and his physical health and pain problems.  He also stated that the had stepped in a hole and fractured his ankle two weeks prior, but had been unable to get an orthopedic appointment until July.  Plaintiff verbalized frustration associated with that delay.  He also reported continued nightmares and PTSD symptoms.  It was recommended that plaintiff see Bob Bronson for assistance with his PTSD, so an appointment was scheduled.  At this time, plaintiff was assessed with a GAF of 55.  (Tr. 445-446).

A medication note dated September 2008 indicates that plaintiff was taking Acyclovir, Alprazolam, Bupropion, Cyclobenzaprine, Hydrocodone, Levothyroxine, Loratidine, and Vardenafil.  (Tr. 431-432).

In spite of the evidence indicating that plaintiff was suffering from depression and that his condition was not responding favorably to medication, the ALJ determined that plaintiff's depression was non-severe.  While we are cognizant of the evidence indicating that plaintiff was

13

able to attend college courses two days per week via computer and in person at UAFS and to maintain good grades, we do not find that this fact alone indicates that plaintiff's mental impairment is non-severe. It is possible for an individual to suffer from a severe mental impairment, yet still be able to attend college or perform work-related activities on some level. The term severe is not synonymous with the term disabled. By definition, an impairment is non-severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities. *See Bowen v. Yuckert,* 482 U.S. 137, 153, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); *id.* at 158, 107 S.Ct. 2287 (O'Connor, J., concurring); 20 C.F.R. § 404.1521(a). If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two. *Page v. Astrue,* 484 F.3d 1040, 1043 (8th Cir. 2007).

The ALJ relies on the one time assessment of Dr. Kralik to substantiate her findings. *See Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999) (holding that the opinion of a consulting physician who examined the plaintiff once or not at all does not generally constitute substantial evidence). First, we note that Dr. Kralik's assessment was performed in 2007, prior to plaintiff's participation in psychotherapy through the VA and prior to the VA's determination that his depression was 50% disabling. Dr. Kralik assessed him with a GAF between 61 and 70, which is indicative of some difficulty in social, occupational, or school functioning. *See* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS IV-TR 34 (4th ed. 2000). She also concluded that plaintiff's capacity to carry out activities of daily living and daily adaptive functioning was somewhat impaired for occupational purposes. However, she was not asked to complete a mental RFC assessment. In fact, there is no mental RFC assessment in the file at all.

14

Therefore, it is not clear whether Dr. Kralik or others would have rated his impairment to be severe or not.

Looking at the medical evidence of a whole, we note that plaintiff's most recent GAF assessments were a 55 in June 2008 and 45 in March 2008.  (Tr. 395, 445-446).  At this time, he was experiencing some suicidal ideations and social isolation.  A GAF of 45 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)," while a score of 55 signifies "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  *See* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS IV-TR 34 (4th ed. 2000).

 It is also noted that plaintiff experienced various medication changes and dosage adjustments in an effort to treat his depression.  Records show he reported experiencing the traditional symptoms of depression along with PTSD symptoms related to his prior employment as a criminal investigator/police officer.  This led the VA to determine that his depression constituted a 50% disability rating.   While we note that the VA's determination is not binding on the Administration, we do believe that when combined with the medical evidence it suggests that plaintiff's depression was at least severe. *See* 20 C.F.R. § 404.1504; *Morrison v. Apfel*, 146 F.3d 625, 628 (8th Cir. 1998).  Therefore, we believe remand is necessary to allow the ALJ to reconsider the severity of plaintiff's mental impairment.

On remand, the ALJ is directed to address interrogatories to Drs. Cohen and Kralik, asking them to review plaintiff's medical records during the relevant time period; complete an

15

RFC assessment regarding plaintiff's capabilities during the time period in question; and, give the objective basis for their opinion, so that an informed decision can be made regarding plaintiff's ability to perform basic work activities on a sustained basis during the relevant time period in question. *Chitwood v. Bowen*, 0788 F.2d 1376, 1378 n.1 (8th Cir. 1986); *Dozier v. Heckler*, 754 F.2d 274, 276 (8th Cir. 1985).

It also seems that there might be additional evidence not in the record that relates to the examination that formed the basis for the VA's disability rating for plaintiff's mental impairment. On remand, the ALJ should attempt to obtain any and all additional medical evidence related to plaintiff's mental impairment.

**Conclusion:**

Accordingly, we conclude that the ALJ's decision is not supported by substantial evidence and should be reversed and remanded to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

DATED this 9th day of June 2010.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

16

AO72A
(Rev. 8/82)